## AMERICAN MARITIME ASSOCIATION, Appellant,

v.

## UNITED STATES of America, et al.

### No. 84–5796.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 10, 1985.
Decided March 28, 1986.

---

Joseph A. Klausner, with whom Allan A. Tuttle and Michael D. Esch, Washington, D.C., were on brief for appellant.

John H.E. Bayly, Jr., Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on brief for appellees, U.S., et al.

T.S.L. Perlman, with whom William H. Fort, Washington, D.C., was on brief for appellee, Moore McCormack Bulk Transport, Inc.

Before WALD, GINSBURG and BORK, Circuit Judges.

Opinion for the Court filed by Circuit Judge BORK.

BORK, Circuit Judge:

Appellant, American Maritime Association ("AMA"), brought this action to challenge the Maritime Subsidy Board's decision to amend its operating-differential subsidy contracts with subsidized carriers. The amendment permits those carriers to ship Military Sealift Command ("MSC") cargo for the Navy. The district court granted the defendants' motion for summary judgment and AMA filed a timely appeal to this court. We remand this case to the district court with instructions to vacate a portion of the Board's July 6, 1984, opinion so that the Board may explain more fully its action of May 24, 1984.

## I.

Because the construction and operating costs of American ships are substantially higher than those of their foreign counterparts, Congress has enacted several laws for the protection of the American merchant marine. The "Jones Act," as it is popularly known, restricts the domestic "coastwise" trade—the carriage of goods between ports in the United States—to American-flag vessels built in the United States. *See* 46 U.S.C. § 883 (1982). Many of appellant's ships fit this description and perform shipping service in the domestic trade free from foreign competition. In addition, the Military Cargo Preference Act requires that 100% of military supplies shipped by the Department of Defense on commercial vessels must be carried by U.S.-flag vessels unless such vessels are unavailable. *See* 10 U.S.C. § 2631 (1982). American-flag ships bidding for military cargo, however, need not have been built in the United States.

Congress has also adopted measures to allow American-flag ships to compete on an equal footing with foreign-flag vessels in markets open to foreign ships. The Merchant Marine Act of 1936 provides subsidies for the construction and operation of U.S.-built, U.S.-flag ships. *See* 46 U.S.C. §§ 1151–1158 (1982). Under the construction-differential subsidy program, the government pays an American shipyard the difference between the price it actually pays and the price the shipowner would pay for a similar vessel in a foreign shipyard. *Id.* §§ 1152, 1155. The subsidy is limited, however, to 50% of the American price. *Id.* § 1152(b). Under the operating-differential subsidy program, the govern-

ment pays the shipowner a subsidy to offset some of his higher operating costs due to wages, upkeep, and insurance. *See* 46 U.S.C. § 1172 (1982).

Intervenor Moore McCormack built its ships with the aid of construction-differential subsidies paid by the Board to the shipyard. Moore McCormack sought to operate these U.S.-flag ships in foreign trade in competition with foreign-flag ships and contracted with the Board to receive operating-differential subsidies. A clause in the contract required Moore McCormack not to carry cargo subject to cargo preference laws such as the Military Cargo Preference Act. In 1977 and 1980, the Board amended this clause to permit Moore McCormack to carry oil for the strategic petroleum reserve and to carry MSC cargo for the Navy when unsubsidized ships failed to compete for it. The Board made these amendments informally, without hearings or proceedings, and without soliciting the views of third parties.

Except for the narrow exceptions contained in these amendments, the subsidy contract continued to bar Moore McCormack from bidding for MSC cargo. In 1981, Congress enacted the so-called "Snyder Amendment," Pub.L. No. 97–35, 95 Stat. 751, to the Merchant Marine Act, which permits subsidized carriers to "elect, for all or a portion of its ships, to suspend its operating differential subsidy contract with all attendant statutory and contractual restrictions" if the carrier foregoes operating subsidies and repays a proportionate share of any construction subsidies. *See* 46 U.S.C. § 1184 (1982). Because of reduced demand for tankers in the foreign trade markets, Moore McCormack elected in 1983 to suspend its subsidy contract for one of its ships and repaid a proportionate share of its construction subsidy. The ship was then chartered by the MSC.

## II.

Unilateral election under the Snyder Amendment, however, is not the exclusive method by which carriers with operating-differential subsidy contracts can overcome their contractual restriction on carrying military cargo. The present action arose out of a request by Moore McCormack in January, 1984, that the Board amend its subsidy contract to permit it to carry MSC cargo. Moore McCormack proposed to forego operating subsidies while carrying MSC cargo in foreign trade, but did not propose to refund construction subsidies as would have been required had it by-passed the Board under the Snyder Amendment. The Board published notice of the request and invited both public comment and similar requests by other subsidized carriers. *See* 49 Fed.Reg. 9297 (1984). The Board received additional requests as well as comments from AMA and its members opposing the proposed amendments. The AMA protested that the MSC trade was already severely overtonnaged and urged that if this was disputed, the Board should conduct a hearing to assess the impact of the proposed amendments on the trade. On April 11, 1984, the Board decided that a public hearing was not required by statute and that no discretionary public hearing would be held. Joint Appendix ("J.A.") at 81. On May 24, 1984, the Board authorized amendment of Moore McCormack's operating subsidy contract and those of the other carriers who had requested such amendment. J.A. at 83. The Board issued an opinion explaining these actions on July 6, 1984. *See Moore McCormack Bulk Transport, Inc.*, Docket No. S–754, 22 Ship.Reg. Rep. (P & F) 1102 (MSB 1984).

AMA brought suit in the district court seeking to vacate and enjoin enforcement of the Board's decision of May 24, 1984 and opinion of July 6, 1984. The court granted the defendants' motion for summary judgment and dismissed the complaint.

AMA challenged the Board's action on essentially three grounds. First, it claimed that the Board relied improperly on an unpublished staff memorandum not subject to public comment. The court rejected this argument, finding that the Board's amendment of a contract provision not required by statute was exempt under 5 U.S.C. § 553(a)(2) (1982) from section 553's notice

and comment requirements and that the Board did not intend to bring its action voluntarily within the provisions of section 553. *See American Maritime Association v. United States,* Civ.Action No. 84–2236, mem. op. at 7–8 (D.D.C. Oct. 29, 1984), J.A. at 21–22. Second, AMA argued that the Board erroneously concluded that it was without statutory authority to condition amendment on repayment of construction subsidies. The district court found this argument meritless. Though the Board's opinion stated "there is no authority for such a condition," 22 Ship.Reg.Rep. (P & F) at 1107, the court found that "the context of the statement makes it clear that the Board meant there was no legal precedent requiring it to impose such a condition." Mem. op. at 10, J.A. at 24. Third, AMA contended that the Board gave inadequate consideration to whether the proposed contract amendments were consistent with the policy of the Merchant Marine Act. The court rejected this claim, noting that AMA adduced no evidence to contradict the Board's finding that retention of construction subsidies by the applicants would not preclude competition by AMA vessels. *See* mem. op. at 11, J.A. at 25.

AMA now appeals the district court's decision, raising basically the same objections to the Board's action as it raised below.

### III.

Appellant's most significant challenge to the Board's action is its claim that the Board erroneously concluded that its action furthered the Merchant Marine Act's policy of maintaining a merchant marine "capable of serving as a naval and military auxiliary in time of war or national emergency." 46 U.S.C. § 1101 (1982). In its July 6, 1984 opinion, the Board concluded that the proposed amendments furthered this policy "[s]ince the trade under consideration is charter to the MSC carrying military cargoes." 22 Ship.Reg.Rep. (P & F) at 1107.

The Board stated that "[i]n arriving at this conclusion, the Board has taken into consideration the impact of its action on unsubsidized operators." *Id.* Presumably, consideration of that factor was required because permitting competition that would drive a substantial number of ships from the market, and thereby ultimately reduce the number of ships available for such service, might contravene the policy of the Act. The Board noted that "[a]n analysis of the [construction subsidy] impact on charter rates by the [Maritime Administration] staff indicates that allowing subsidized operators to compete for MSC charters without [operating subsidies] and without repayment of [construction subsidies] might possibly lower the overall charter rates bid by a few cents per deadweight ton per *month* but not enough to preclude [unsubsidized] vessels from competing for these cargoes," *id.* at 1108 (emphasis added), and concluded that therefore "the adverse impact on other U.S.-flag operators is minimal." *Id.*

In the course of the proceedings before the district court, however, the Board conceded that its opinion should have read "a few cents per deadweight ton per *day,*" rather than "per *month.*" *See* J.A. at 122 n. \*. The Board has acknowledged this error again on appeal. *See* Brief for Federal Appellees at 15 n. 6.

AMA argues forcefully that this error should invalidate the Board's conclusion that permitting construction-subsidized ships to compete for MSC cargo will have only a "minimal" adverse impact on unsubsidized ships. AMA estimates that retention of construction subsidies results in "a cost advantage per ton per month of $1.59," Brief for Appellant at 31, and maintains that this advantage is "insuperable" in a market where "current MSC time-charter rates [are] below $12, which are breakeven or less." *Id.* Thus, AMA insists that the proposed contract amendments do not further, but undermine, the statutory policy of maintaining an adequate, militarily-useful merchant marine because their effect will be to force many unsubsidized ships from the market, thereby reducing the number of ships available for military carriage.

We think that the Board's opinion does not adequately assess the impact of the proposed contract amendments on unsubsidized shippers. In particular, the opinion does not indicate with precision the evidentiary basis upon which it relied to determine that competition by subsidized ships would have only a minimal adverse impact on unsubsidized ships. For example, the Board stated:

> The Jones Act ships which would purportedly be displaced, i.e., those in lay-up, have not even regularly offered for the same MSC charters sought by subsidized tonnage. The preponderance of MSC charter approvals which have been granted to [tankers with operating-differential subsidies] have been for spot charters where Jones Act ships were either not offered or not responsive to the requirements of MSC's [Request for Proposals].

22 Ship.Reg.Rep. (P & F) at 1108. This statement provides inadequate support for the Board's conclusion of minimal adverse impact. The Board's opinion does not indicate the proportion of MSC charters in which unsubsidized ships were not offered. That subsidized ships were chartered when unsubsidized ships were unavailable does not, by itself, demonstrate that the two categories of ships will not compete for the same charters. Moreover, one salient fact—the impact of subsidized competition on charter rates—was admittedly misstated by a factor of thirty.

Given the limited and partially erroneous factual basis underlying the Board's conclusion of minimal adverse impact, we find it difficult to accept, or even review, the accuracy of the Board's conclusion. We are hesitant for two reasons, however, to reverse the Board's decision permitting amendments to the operating subsidy contracts. First, we are not certain that the Board is required by the Act to consider the competitive impact of this particular contract amendment on unsubsidized ships. Certainly the Board's opinion is ambiguous on this point and we would prefer to review the Board's action with an indication of whether the Board believes that, prior to amending the contracts as requested, it is required to make a finding that the adverse impact of such action on existing carriers is minimal.

Second, even if the Board concludes that it is so required, the Board's action may still be appropriate. Having recognized its factual error, the Board may be able to set forth a sufficient and accurate evidentiary basis to support a finding of minimal adverse impact. For example, retention of construction subsidies may simply fail to put existing ships at a competitive disadvantage. This is not, as the Board suggests, because such subsidies are paid to the shipyard rather than to the shipowner; the shipowner's carrying charges on its debt are correspondingly reduced in either case. Moore McCormack does, however, make the following point: "Ships bidding for MSC cargo must fly the American flag, but their American owners may build them abroad and import them. One of appellant's vessels in this case was built in Japan and immediately chartered to MSC." Brief for Moore McCormack at 5. By definition, ships built in the United States with the aid of construction subsidies have no competitive advantage over unsubsidized ships built abroad. Similarly, Moore McCormack notes that "[o]thers of appellant's ships were built with construction subsidies (although they do not receive operating subsidies) and have been chartered by appellant to MSC." *Id.* Thus, we cannot conclude that admitting ships built with construction subsidies into the military trade will necessarily have an adverse impact on existing carriers.

## IV.

Except for the reservations discussed above, we think that the district court decision to grant the defendant's motion for summary judgment was correct and we affirm for the reasons given by that court. Therefore, we remand this case to the district court so that it may vacate Part IV–c of the Board's opinion and instruct the Board to specify whether it believes it must consider the competitive impact on unsubsi-

dized ships before it can allow construction-subsidized vessels into the military trade, and if so, make findings based on adequate and articulated facts concerning that impact.

*It is so ordered.*